UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
REPAT, INC.,                                    )
                    Plaintiff,                  )
                                                )
        v.                                      )  Civil Action No. _____
                                                )
INDIEWHIP, LLC; CHANDLER R. QUINTIN; PAUL M.    )
KETTELLE; AND BRIAN BRUZZI,                      )
                    Defendants.                 )
                                                )
_____)

## COMPLAINT

Plaintiff Repat Inc., ("Repat"), by its attorneys, Lawson & Weitzen, LLP, for its

complaint against Defendants IndieWhip ("IndieWhip"), Chandler R. Quintin ("Quintin"), Paul

M. Kettelle ("Kettelle"), and Brian Bruzzi ("Bruzzi")(together, the "Defendants") states as

follows:

## INTRODUCTION

In 2015, Repat, which sells custom quilts made from customers' t-shirts, engaged

IndieWhip, a Rhode Island video production company, to produce commercial videos and

manage Repat's highly successful online advertising.  One year after Repat terminated the

engagement, IndieWhip and its members, the individual defendants, launched a competing t-shirt

quilt business, American Quilt Company, LLC ("American Quilt"), utilizing trade secrets they

acquired while engaged by Repat.  Defendants have attempted to mask their involvement in

American Quilt by creating shell companies and using pseudonyms in American Quilt's online

communications, including the pseudonym "Joe McMillan," an unethical character on the AMC

television series "Halt and Catch Fire," who steals intellectual property to unfairly compete with his former friends.  Defendants' conduct constitutes misappropriation of trade secrets and unfair competition.  Repat is seeking equitable and legal relief.

## PARTIES

1.      Plaintiff Repat is a Delaware corporation, with a principal place of business in Boston, Massachusetts.

2.      On information and belief, IndieWhip is a Rhode Island limited liability company with a principal place of business in Providence, Rhode Island.

3.      On information and belief, Quintin, Kettelle and Bruzzi are the sole members of IndieWhip.

4.      On information and belief, Quintin is a resident of Central Falls, Rhode Island.

5.      On information and belief, Kettelle is a resident of Providence, Rhode Island.

6.      On information and belief, Bruzzi is a resident of Cumberland, Rhode Island.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. § 1332(a) and 18 U.S.C. § 1836(c).

8.      The amount in controversy exceeds the sum of $75,000.

9.      This Court has personal jurisdiction over the Defendants pursuant to Mass. Gen. Laws ch. 223A §§ 3(a), (b), and (c), and the Due Process Clause of the United States Constitution.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(b)(3).

## FACTUAL BACKGROUND

***Repat sells custom t-shirt quilts.***

11.     Repat was incorporated in Delaware in 2012.

12.     Repat sells custom quilts made from customers' t-shirts.  Repat's customers select a quilt size and then ship to one of Repat's contract manufacturers the t-shirts they want sewn into their custom made quilts.  Repat's contract manufacturers cut the t-shirts into squares, stitch the squares together and then back the quilts with PolarTec fleece.

13.     Repat contracts with manufacturers in Massachusetts and in North Carolina to manufacture its quilts.

14.      Since 2012, Repat has sold and shipped approximately 140,000 t-shirt quilts to customers throughout the United States and internationally.

15.     Repat's 2015 sales exceeded $4 million.

***Repat engaged IndieWhip to produce marketing videos and implement Repat's online advertising strategy.***

16.     IndieWhip is a video production and advertising company headquartered in Providence, Rhode Island.  IndieWhip produces videos to support its clients' advertising and marketing campaigns.

17.     On information and belief, Quintin, Kettelle, and Bruzzi (together, the "Individual Defendants") are the founders and only members of IndieWhip.

18.     IndieWhip's website indicates that Quintin is the company's Managing Director, that Kettelle is its Executive Producer and that Bruzzi is its Creative Director.

19.     In or about September 2014, Repat engaged IndieWhip to produce a commercial video.

20.     In 2015, Repat contracted with IndieWhip to produce two additional videos, including a video of certain nonproprietary features of Repat's quilt manufacturing process.

21.     In February 2015, Defendants visited the facility of Repat's contract manufacturer in Fall River, Massachusetts, Precision Sportswear, to film the quilt manufacturing process.

22.     While Repat disclosed to Defendants the entire manufacturing process, Repat made clear to Defendants that only the nonproprietary portions of the process were to be filmed and included in the video.

23.     Between September 2014 and July 2015, IndieWhip produced three videos for Repat at a cost of approximately $20,000.

24.     Beginning in or about April 2015, Repat expanded the scope of its engagement of IndieWhip to include managing Repat's online advertising strategy, including managing Repat's Google AdWords, Facebook and YouTube advertising accounts.  In addition, Repat contracted with IndieWhip to manage its program of direct emailing to Repat customers and prospective customers who expressed interest in Repat's products, , and gave IndieWhip access to its email marketing software, Klaviyo.  Finally, Repat engaged IndieWhip to build a "landing page" for Facebook and Google users offering to provide them with a code to obtain a discount on a Repat quilt.

25.     In the course of Repat's engagement of IndieWhip, Defendants met with Repat in Massachusetts on at least three (3) occasions and regularly communicated with Repat in Massachusetts by email and telephone.

26.     While performing work for Repat, Defendants acquired a wealth of highly confidential information concerning Repat's advertising strategy and best practices, which were the product of at least three years of trial and error and considerable expense.

27.     For example,  because Defendants managed Repat's Facebook advertising account, Defendants acquired knowledge of the following:

      a.   the customer profile of Repat's targeted advertising;

      b.   the amounts Repat spends on advertising, broken down by target audience;

      c.   Repat's customer acquisitions costs and its determination concerning the appropriate cost per customer acquisition, which resulted from implementation of a series of tests recommended by Facebook; and

      d.   Repat's "best practices" for Facebook advertising, which are the product the product of three years of experience with Facebook advertising.

28.     Moreover, because Defendants managed Repat's Google AdWords advertising account, Defendants acquired knowledge of the following:

      a.   the keywords that Repat has used on Google Pay-per-Click and which keywords generated customers and which did not;

      b.   the keywords that Repat has used on YouTube and which keywords generated customers and which did not;

      c.   the amounts Repat spent on each Google advertising campaign, and which campaign generated customers and which did not;

      d.   Repat's "best practices" for Google advertising, the product of three years of experience with Google advertising.

29.     In addition, because Defendants managed Repat's email advertising campaigns, Defendants acquired knowledge of the following:

      a.   the email addresses, demographic information and purchasing history of more than 100,000 Repat customers;

    b.   how Repat segmented its customer list for specific email campaigns;

    c.   the design of Repat's email series, including the "Welcome" and "Abandoned Cart" series,  and the extent to which those series generated customers;

    d.   methods utilized by Repat for acquiring new customer email addresses of visitors to Repat's ecommerce store; and

    e.   Repat's "best practices" for email advertising, the product of three years of experience with email advertising.

30.    Finally, because Defendants produced the video of Repat's manufacturing process, they acquired knowledge, not included in the video, about the proprietary features of the process used by Repat to manufacture its t-shirt quilts.

31.    The confidential information described in the preceding paragraphs constitutes Repat's trade secrets (the "Trade Secrets").

32.    Repat's Trade Secrets are not generally known or easily ascertainable, and they have significant value not only to Repat but to its competitors, especially a new competitor, which through use of the Trade Secrets could avoid significant startup costs and the costs of learning how to most effectively advertise t-shirt quilts.

33.    Repat employed reasonable measures to maintain the confidentiality of its Trade Secrets.

34.    Many of the emails exchanged between Repat and Defendants include Repat Trade Secrets.  On information and belief, IndieWhip has retained the emails it exchanged with Repat containing Repat Trade Secrets.

35.    In addition, many of the reports that Defendants generated for Repat on IndieWhip computers include Repat Trade Secrets.

36.     For example, IndieWhip prepared reports to Repat detailing how much Repat spent on Facebook and Google advertising and the extent to which those expenditures generated sales for Repat.

37.     Again, on information and belief, IndieWhip has retained the reports that it prepared for Repat that contain Repat Trade Secrets.

38.     Repat terminated its engagement of IndieWhip in or about August 2015.

39.     During Repat's engagement of IndieWhip, Repat was not aware that Defendants were planning or would plan to compete with Repat or to assist others to compete with Repat.

40.     Repat would not have engaged IndieWhip if it believed or had any reason to believe that Defendants were planning or would plan to compete with Repat or to assist others to compete with Repat.

***Defendants disclosed and/or used Repat's Trade Secrets to launch American Quilt.***

41.     Despite Repat's termination of IndieWhip in August 2015, Defendants have continued to access emails containing Repat's Trade Secrets.

42.     The email tracking software used by Repat, Yesware, indicates that as recently as October 18, 2016, while in Houston, Texas, one or more Defendants accessed a June 2, 2015 email between Repat and IndieWhip that contained Repat's Trade Secrets, including but not limited to information concerning Repat's customer acquisition costs.  According to postings on his Twitter account, Quintin was in Houston on October 18, 2016.

43.     On information and belief, Defendants used or disclosed Repat Trade Secrets in connection with the launch of American Quilt, which now competes with Repat in the t-shirt quilt market.

44.     American Quilt was formed on or about August 31, 2016, approximately one year after IndieWhip's engagement with Repat terminated.

45.     According to its website, American Quilt sells "t-shirts sewn together with a luxurious backing."

46.     American Quilt directly competes with Repat.

47.     American Quilt has attempted to mimic Repat in significant ways, including in the design of its website which mimics Repat's website both in its form and content.

48.     American Quilt is a Connecticut limited liability company, which in its filings with the Connecticut Secretary of State lists its business address as 100 Riverview Center, Suite 130, Middletown, Connecticut.

49.     On information and belief, the sole member of American Quilt is BradyChloe, LLC ("BradyChloe").

50.     BradyChloe is a Connecticut limited liability company, which in its filings with the Connecticut Secretary of State also lists its business address as 100 Riverview Center, Suite 130, Middletown, Connecticut.

51.     On information and belief, the sole member of BradyChloe is Carlson & Dumeer, LLC ("Carlson & Dumeer").

52.     Carlson & Dumeer is a Connecticut limited liability company, which in its filings with the Connecticut Secretary of State also lists its business address as 100 Riverview Center, Suite 130, Middletown, Connecticut.

53.     Carlson & Dumeer is the registered agent of American Quilt and BradyChloe.

54.     On information and belief, the sole members of Carlson & Dumeer are Scott M. Carlson, Esq. ("Carlson") and H. Brian Dumeer, Esq. ("Dumeer").

55.   According to its website, Carlson & Dumeer is a law firm with an office located at 100 Riverview Center, Suite 130, Middletown, Connecticut.  Carlson & Dumeer has represented IndieWhip in the past.

56.   On information and belief, Carlson is married to Emily Quintin Carlson, who, on information and belief, is the sister of Defendant Quintin.

57.   Defendants have been careful to avoid exposing their relationship to American Quilt.

58.   For example, to avoid exposing his involvement with American Quilt, Quintin is using pseudonyms based on characters from television series airing on the AMC network.  The most brazen and telling alias is "Joe MacMillan," which American Quilt has utilized in forum posts on the Shopify website.  In the AMC television series "Halt and Catch Fire," a show that Quintin mentions frequently on his Twitter account, Macmillan is a deceptive character who steals intellectual property software from his friends to start a competing business.  Joe Macmillan is described in the "halt and Catch Fire" Wikia page as having "circus show-man bravado," and as a man who "reverse engineers his former employer's product and builds something better." In addition, the only individual name appearing on the American Quilt website, "Joan Teller," purportedly the customer service associate, is an alias based on the character "Joan" from the AMC television series "Mad Men" who during one season of the show worked at "Bonwit Teller" as a customer service associate.

59.   However, there is evidence of a relationship between Defendants and American Quilt.  For example, as of October 11, 2016, on its Twitter account American Quilt had "liked" only twenty (20) tweets.  Of the twenty tweets American Quilt "liked," all but two were tweets from IndieWhip, the Individual Defendants or the spouse of an Individual Defendant.

60.     On September 23, 2016, Emily Quintin Carlson, who on information and belief is Defendant Quintin's sister, shared American Quilt's photo on Facebook and posted that the she was "excited" about the project.  Emily Quintin Carlson subsequently deleted the Facebook post.

61.     On September 26, 2016, Ross Lohr, a co-founder of Repat, texted the following to Defendant Quintin, with whom he had a friendly and positive business relationship: "tell me about American Quilt Co."  Quintin never responded to the text.

62.     One of the first two "likes" on Facebook posts by American Quilt during the week of October 18, 2016 was Christina "CC" Pelland ("Pelland"), who, on information and belief, is Quintin's girlfriend.

63.     On behalf of IndieWhip, Pelland took photographs for Repat in 2015.  On information and belief, Pelland took photographs for American Quilt that appear on its website.

64.     By letter dated October 3, 2016, Repat demanded that the Defendants cease and desist using Repat Trade Secrets in support of American Quilt and further demanded that the Defendants "secure and return all of [Repat's] confidential and trade secret information including return of its customer mailing lists."

65.     In its October 7, 2016 response, IndieWhip asserted that Repat has no trade secrets and did not deny the involvement or association of any of the Defendants with American Quilt.  IndieWhip has not returned any documents to Repat and, in particular, has not returned the Repat customer list.

## COUNT ONE
(Defend Trade Secrets Act, 18 U.S.C. § 1836)

66.     Repat repeats and realleges paragraphs 1 through 65 above as if fully set forth herein.

67.     Repat is the owner of the Trade Secrets.

68.     The Trade Secrets relate to the advertising, marketing, sale and manufacturing of Repat quilts, which are advertised, manufactured, intended for sale and sold in interstate commerce.

69.     Repat's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

70.     Repat's efforts to maintain the secrecy of the Trade Secrets were reasonable under the circumstances.

71.     On information and belief, Defendants have used and/or disclosed Repat's Trade Secrets in connection with their involvement and/or association with American Quilt.

72.     Defendants know and have known or had reason to know that they acquired knowledge of Repat's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

73.     Defendants' use and/or disclosure of Repat's Trade Secrets constitutes the misappropriation of trade secrets under 18 U.S.C. § 1839(5)(B)(i)(II).

74.     Defendants' misappropriation of Repat's Trade Secrets was and is willful and malicious.

75.     Defendants' misappropriation of Repat's Trade Secrets has caused and will continue to cause Repat to suffer damages in an amount to be determined at trial.

## COUNT TWO
(Trade Secret Misappropriation: M.G.L. c. 93 § 42 and Common Law)

76.     Repat repeats and realleges paragraphs 1 through 75 above as if fully set forth herein.

77.     Repat's Trade Secrets relate to the advertising, marketing, sale and manufacturing of Repat quilts.

78.     Repat's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

79.     Repat has employed reasonable measures to protect the confidentiality of the Trade Secrets.

80.     Defendants came to know the Repat Trade Secrets only through their work on behalf of Repat and were at all times subject to an obligation to keep the Trade Secrets confidential.

81.     On information and belief,  Defendants breached their obligations of confidentiality and have used and/or disclosed Repat's Trade Secrets in connection with their involvement and/or association with American Quilt.

82.     Defendants' use and/or disclosure of Repat's Trade Secrets constitutes the misappropriation of trade secrets under M.G.L. c. 93 § 42 and Massachusetts common law.

83.     Defendants' misappropriation of the Trade Secrets has caused and will continue to cause Repat to suffer damages in an amount to be determined at trial.

## COUNT THREE
(Trade Secret Misappropriation: R.I. Gen. L. § 6-41)

84.     Repat repeats and realleges paragraphs 1 through 83 above as if fully set forth herein.

85.     Repat's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

86.     Repat's efforts to maintain the secrecy of the Trade Secrets were reasonable under the circumstances.

87.     On information and belief Defendants have used and/or disclosed Repat's Trade Secrets in connection with their involvement and/or association with American Quilt.

88.     Defendants know and have known or had reason to know that they had acquired knowledge of Repat's Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

89.     Defendants' use and/or disclosure of Repat's Trade Secrets constitutes the misappropriation of trade secrets under R.I. Gen. L. § 6-41-1.

90.     Defendants' misappropriation of Repat's Trade Secrets was and is willful and malicious.

91.     Defendants' misappropriation of the Trade Secrets has caused and will continue to cause Repat to suffer damages in an amount to be determined at trial.

## COUNT FOUR
(Unfair Competition: M.G.L. c. 93A, § 11)

92.     Repat repeats and realleges paragraphs 1 through 91 above as if fully set forth herein.

93.     Repat engages in trade or commerce.

94.     Defendants' conduct constitutes unfair methods of competition in the conduct of trade or commerce in violation of M.G.L. c. 93A, § 2.

95.     Defendants' use or employment of unfair methods of competition was a willful and knowing violation of M.G.L. c. 93A, § 2.

96.     Defendants' conduct has caused and will continue to cause Repat to suffer damages, including loss of money, in an amount to be determined at trial.

WHEREFORE, Plaintiff Repat respectfully prays the Court:

1.      Enter judgment in favor of Repat on all claims;

2.      Enter preliminary and permanent injunctions prohibiting Defendants from using and/or disclosing  Repat's Trade Secrets and requiring that Defendants return to Repat all documents, regardless of format, containing Repat's Trade Secrets or other confidential information ;

3.      Award damages to Repat in an amount to be determined at trial;

4.      Award multiple damages to Repat pursuant to 18 U.S.C. § 1836(b)(3)(C), M.G.L. c. 93, § 42,  R.I. Gen. L. § 6-41-3(b) and M.G.L. c. 93A, § 11;

5.      Award Repat its costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D),  R.I. Gen. L. § 6-41-4(c)  and M.G.L. c. 93A, § 11; and

6.      Grant such other and further relief as the Court deems just and proper.


## JURY DEMAND

Repat demands a trial by jury on all issues so triable.

Dated: October 24, 2016

Respectfully submitted,

PLAINTIFF
REPAT, INC.


By its attorneys,


/s/ John R. Bauer
John R. Bauer (BBO #630742)
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue
Boston, MA 02210
Telephone: (617) 439-4990
Facsimile: (617) 439-3987
jbauer@lawson-weitzen.com