UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-12146-RGS

REPAT, INC.

v.

INDIEWHIP, LLC; CHANDLER R.
QUINTIN; PAUL M. KETTELLE; BRIAN BRUZZI;
and AMERICAN QUILT COMPANY, LLC

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

December 14, 2017

STEARNS, D.J.

This case is a tale of misplaced confidence, deceit, and betrayal, followed by protracted and bitter litigation, signifying in the end – nothing. In the Amended Complaint, plaintiff Repat, Inc., alleges that defendants IndieWhip, LLC, and its members, Chandler Quintin, Paul Kettelle, and Brian Bruzzi, stole trade secrets developed "over three years and at a cost of hundreds of thousands of dollars" comprising Repat's strategies for marketing and selling customized t-shirt quilts and pillows. Repat asserts that Ketelle, Bruzzi, and Quintin, who had access to the alleged trade secrets in their role as consultants to Repat, surreptitiously exploited these secrets

to enable Quintin's brother-in-law, Scott Carlson, to launch a business, defendant American Quilt, LLC that competes directly with Repat.

Discovery having concluded, defendants now move for summary judgment. They raise familiar defenses: that Repat's e-commerce marketing strategies were too "vaguely described" to merit protection as trade secrets; that the "secrets" are not in fact proprietary, but are generally known in the trade; and that, even if properly viewed as trade secrets, Repat failed to protect their confidentiality as required by law.[1]  Additionally, defendants maintain that Repat has failed to produce any evidence that American Quilt copies (makes use) of Repat's marketing strategies.  In response, Repat concedes that, while "it has disclosed in blogs, interviews and the like non-confidential aspects of its marketing and advertising efforts," there remains portions of its "digital marketing practices and strategies [that] are not generally known or easily ascertainable."  Moreover, Repat asserts that material factual disputes exist as to "whether the IndieWhip defendants

---

[1] In its Amended Complaint, Repat claimed that in addition to the marketing strategies, defendants appropriated secret aspects of its production processes and copied its customer lists, claims that Repat has abandoned on summary judgment.  Repat has produced no evidence countering defendants' assertion of facts that "American Quilt does not use Repat's manufacturing process," nor does it use Repat's customer list.  Defs.' Statement of Undisputed Facts (SOF) (Dkt #77 ¶¶ 85, 91-92, 112-113; Defs.' Mem. at 18.

disclosed Repat's trade secrets to American Quilt." Repat's SOF ¶ 9; Pl.'s Opp'n at 1.[2] For the reasons that follow, defendants' motion for summary judgment will be ALLOWED.

BACKGROUND

Nathan Rothstein and Ross Lohr co-founded Repat in 2012. The company sells custom quilts and pillows made from customers' t-shirts. Repat customers send used t-shirts to one of Repat's contract manufacturers in Massachusetts or North Carolina. The t-shirts are cut into squares and stitched together to form a quilt, which is then backed with fleece. Between 2012 and 2016, Repat sold some 140,000 t-shirt quilts; its 2015 sales exceeded $4 million, and by 2016, it was selling as many as 1,000 quilts a week. As the business grew, Repat tested different key words and ad pitches in its online marketing, determining those that most successfully generated

---

[2] Repat's submission in response to Defendants' Statement of Undisputed Facts (Dkt. #77) is a counter-statement of facts entitled Repat, Inc.'s Statement of Material Facts of Record in Dispute as to Which It Contends There Exists a Genuine Issue to be Tried. Beginning on page 12, the counter-statement responds to some of defendants' numbered factual statements. While the court allowed defendants to admit as unopposed the numbered statements in their submission to which Repat did not respond (*see* Dkt. #94 at 17; 19-31; 33-46; 48-53; 55-57; 60-61; 63-64; 66-68; 70-71; 73-81; 84-86; 88-89; 92; 95-96; 101-103; 105-106; 109-113), the court notes that defendants, for their own part, have failed to respond to Repat's numbered facts 1-48.

"a profitable CPA" (cost to acquire a customer for each keyword) and an "excellent ROI" (return on investment for each keyword) when used in conjunction with Google Adwords.

Over its five years of existence, Repat engaged a number of ecommerce marketing companies to assist it in formulating internet and email sales strategies. Since March of 2013, Repat has hired, among others, Klaviyo (ecommerce marketing platform); Mischa Stevens (Adwords and search engine optimization (SEO)); Social Fulcrum (SEO); Green Banana (SEO); JB Media (SEO); Ecommerce Influence (optimizing email marketing sequences and flow); Jivaldi, LLC (conversion tracker); and Jonathan Schwartz (web development services). All of these hires had access to Repat's claimed trade secrets, but only Stevens and JB Media signed nondisclosure agreements.

IndieWhip is a video production and advertising company based in Providence, Rhode Island. IndieWhip designs digital advertising and email marketing campaigns supported by custom videos. In September of 2014, Repat hired IndieWhip to make a video for its website. In 2015, Repat commissioned IndieWhip to produce two additional videos, including one depicting its quilt manufacturing process. In March and April of 2015, Quintin, Kettelle, and Bruzzi filmed the making of quilts at one of Repat's contract manufacturers, Precision Sportswear, in Fall River, Massachusetts.

Repat alleges that prior to the filming, it made clear to the IndieWhip crew that only nonproprietary aspects of the process were to be recorded.[3] IndieWhip billed Repat approximately $20,000 for the three videos.

In April of 2015, Repat expanded the IndieWhip contract to include the management of Repat's Google AdWords advertising strategy (Repat began using Google AdWords in October of 2012), Facebook, and YouTube. Repat also asked IndieWhip to oversee its email targeting of customers and prospective customers. To that end, Repat allowed IndieWhip to access its Klavio software.[4] Finally, Repat contracted with IndieWhip to build a "landing page" for potential buyers recruited through Facebook and Google.

Repat claims that during the course of the contract, IndieWhip had access to the following trade secrets:

> [D]igital marketing strategies and practices relating to Google AdWords including the specific keywords it has used; its combinations of keywords and ads; the bids and budgets it allocated to keywords; the amount of website traffic (clicks) that resulted from specific keywords-ad combinations; the number of emails Repat collected resulting from that traffic; the revenue

---

[3] In July of 2015, Repat permitted WBUR to record a segment featuring its business. As part of the feature, WBUR filmed Repat's manufacturing process at Precision Sportswear. The video was later posted on the WBUR website. Repat admits that it did not "restrict WBUR's access" to "any part of the manufacturing process." Defs.' Ex. O at 242-243.

[4] As was its practice when working with consultants, Repat changed the passwords to the Google AdWords, Facebook, and Klaviyo accounts after IndieWhip completed the work.

produced as a result of customers clicking on ads that serve the specific keywords; the cost to acquire a customer (CPA) for each keyword; the return on investment (ROI) for each keyword; and the performance of Repat's various ads, including the amount of traffic, revenue, email sign ups, CPA and ROI associated with each ad and the content used for each ad.

*See* Bauer Decl., Ex. 1 (Answers to Interrog.) at #1, #4. Lohr, a founder, director, and officer of Repat, testified that "[t]he most valuable keywords are those that, when associated with an effective Repat ad, have generated the most 'clicks' and 'conversions,' and have the lowest cost per conversion ratios." Lohr Decl. ¶ 13. IndieWhip produced multiple reports for Repat containing detailed descriptions of Repat's marketing strategies and practices. Repat alleges that IndieWhip disclosed this information to American Quilt, including the trade secrets involved in its Facebook campaign.

Repat claims that IndieWhip had access to the specific audiences that Repat has used to target potential customers; the budget allocation to each of those audiences; the number of emails collected on Repat's website for each audience; the amount of revenue derived from each audience; the CPA and ROI for specific audiences used for Facebook advertising; and the performance of Repat's various Facebook ads, including the content. Repat's digital marketing strategies and practices also include the timing and segmentation of marketing emails sent to potential customers and the revenue derived from each of those emails; the content and timing of the emails in the "welcome series," "abandoned cart" series, and "post purchase" flows; and the click rates, open rates and revenues generated by each flow and each email within the flow.

*Id.*[5]  Indiewhip completed its work for Repat in August of 2015.  None of the three written contracts entered into by Repat and IndieWhip over the course of their relationship contained confidentiality provisions or non-competition clauses.

Scott Carlson and Brian Dumeer formed American Quilt as a limited liability company in August of 2016, approximately one year after IndieWhip's engagement with Repat came to an end.  Quintin contends that Carlson first approached him with the idea of creating a business selling "t-shirts sewn together [into a quilt] with a luxurious backing."[6]  (Carlson, it will be remembered, is Quintin's brother-in-law).  Repat asserts that with IndieWhip's covert assistance, American Quilt built a marketing campaign based on Repat's secrets.  Repat contends that

> many of the key words that American Quilt uses in its Google AdWords account are identical to those keywords that IndieWhip learned were Repat's most successful keywords in generating clicks and conversions in its Google AdWords campaigns.  Similarly Quintin created an "abandoned cart flow" that mimics the abandoned cart flow Repat paid Ecommerce Influence to design . . . which Quintin learned while providing services to Repat.  Quintin also created a "shirt reminder flow"

---

[5] Repat maintains that it has never publicly disclosed any of this information.

[6] Quintin testified that the only thing that distinguishes American Quilt's product from that of Repat is "Scott's idea of being more premium, that's the extent of the difference."  Repat Ex. 13 (Quintin Dep.) at 121.

> based on the flow used by Repat to remind customers to send in
> their shirts.

Opp'n Mem. at 15.

Quintin admits that he built American Quilt's website and created its Facebook advertising account in October of 2016. He also identified and procured a manufacturer for American Quilt in New Hampshire, and helped launch American Quilt's online advertising and marketing campaigns. In hiring the manufacturer and recruiting the online advertisers, Quintin used the pseudonym "Joe McMillan."[7] *See* Lohr Decl. ¶ 29; Repat SOF ¶ 29. American Quilt also "hired Klaviyo for email marketing and as a mechanism to collect customer email addresses." Defs.' SOF ¶ 91.[8] Carlson's deposition testimony makes clear that he knows next to nothing about the day-to-day operations of his business, including the identity of the person or persons who created and maintain American Quilt's website, manage its advertising campaigns, oversee its email marketing accounts and its Twitter, Facebook,

---

[7] Fans will recognize the conflicted hero of the AMC Studios' TV series *Halt and Catch Fire* (2014-2017) who reverse engineered the chief product of his former employer with a view to making it better. *See* Am. Compl. ¶ 64.

[8] Repat makes the point that American Quilt's phrasing with respect to this "undisputed fact" is somewhat disingenuous in "that Klaviyo does not manage clients email accounts but rather is simply a platform on which clients design and implement their email marketing campaigns." Opp'n Mem. at 15 n.2.

and Instagram pages, or even how its finished products are shipped. *See* Repat SOF ¶ 43.

By letter dated October 3, 2016, Repat demanded that IndieWhip cease and desist its use of Repat's trade secrets for the benefit of American Quilt. It also demanded that IndieWhip "secure and return all of [Repat's] confidential and trade secret information including return of its mailing lists." Opp'n Mem. at 5. Emails offered by Repat reveal that one month after IndieWhip received the cease and desist letter, Quintin, again hiding under the pseudonym "Joe McMillan," engaged GreenBanana to assume the management of American Quilt's digital marketing efforts. The contract between American Quilt and GreenBanana identified Quentin as the "Client" and the "Principal" for reporting purposes. Bauer Decl. - Ex. 27 at 12. *See id.* at Exs. 29, 30, 32, and 33.

Repat filed this lawsuit on October 24, 2016, asserting four claims – misappropriation of trade secrets under federal law (18 U.S.C. § 1836), and Massachusetts law (Gen. Laws ch. 93, § 42) (Count I); theft of trade secrets under the common law (Count II); theft of trade secrets under Rhode Island law (Gen. Laws § 6-41) (Count III); and unfair competition under the Massachusetts Unfair Business Practices Act (Chapter 93A) (Count IV). The

court heard oral argument on defendants' motion for summary judgment on October 26, 2017.

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment must demonstrate to the court the absence of genuinely disputed material facts by reference to the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that task is accomplished, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 n.2 (1st Cir. 2010).

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357

Mass. 728, 736-737 (1970)). The criteria for a court to consider in deciding

what qualifies as a trade secret:

> 1) the extent to which the information is known outside of the business; 2) the extent to which it is known by employees and others involved in the business; 3) the extent of measures taken by the employer to guard the secrecy of the information; 4) the value of the information to the employer and to his competitors; 5) the amount of effort or money expended by the employer in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (Second) of Torts § 727; *see also Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840 (1972*); Am. Science and Eng'g, Inc. v. Kelly,* 69 F. Supp. 2d 227, 238 (D. Mass. 1999).

To prevail on its misappropriation claims, Repat must show the existence of a trade secret; that it took reasonable steps to preserve its secrecy; and that defendants used improper means, in breach of a confidential relationship, to acquire and use the trade secret.[9] *See Incase Inc. v. Timex Corp.,* 488 F.3d 46, 52 (1st Cir. 2007). "The party asserting the claim must identify with adequate specificity the trade secret or proprietary

---

[9] Under the Rhode Island Uniform Trade Secrets Act (RIUTSA), "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy." R.I. Gen. Laws § 6-41-1(1). "Misappropriation thus includes disclosure of a trade secret by one who acquired it while under a duty to maintain its secrecy and the acquisition of a trade secret by one who knows that it was acquired by breach of a duty to maintain secrecy.*" Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 18 (1st Cir. 2009).

information that was allegedly misappropriated by the defendant." *Ferring Pharm. Inc. v. Braintree Labs., Inc.,* 38 F. Supp. 3d 169, 175 (D. Mass. 2014), *citing Sutra, Inc. v. Iceland Express,* 2008 WL 2705580, at *3-4 (D. Mass. July 10, 2008) (dismissing a trade secret claim because plaintiff's "description of its alleged trade secret [was] overly broad and this lack of specificity [was] fatal to its claim"); *Staffbridge, Inc. v. Gary D. Nelson Assocs., Inc.,* 2004 WL 1429935, at *3 (Mass. Super. June 11, 2004) (Gestel, J.) (holding that a description that included source code, database schema, and customer databases did not adequately distinguish the protectable parts of a software from those that were not protectable).

Repat defines as its trade secret the particulars of the digital marketing practices and strategies program that it developed with its consultants to coordinate the use of Google AdWords, Facebook, and email marketing campaigns – an effort that extended "over three years and at a cost of hundreds of thousands of dollars." There is no doubt that marketing strategies can attain trade secret status.[10] *See Campbell Soup Co. v.* Giles, 47

---

[10] Massachusetts law defines a trade secret as "anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement." Mass. Gen. Laws ch. 93, § 42; Mass. Gen. Laws ch. 266, § 30. Similarly, under RIUTSA, a trade secret is defined as "information . . . that: (i) [d]erives independent economic value, actual or potential, from not

F.3d 467, 469 n.4 (1st Cir. 1995); *Diomed, Inc. v. Vascular Solutions, Inc.,* 417 F. Supp. 2d 137, 143-144 (D. Mass. 2006).

It is also true, as defendants note, that "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as [its] secret." *Sutra*, 2008 WL 2705580, at *3 (*quoting J.T. Healy*, 357 Mass. at 736). Both Rothstein and Lohr conceded in their depositions that certain aspects of their marketing strategy are well within the "known knowns." They insist, however, that other aspects of their marketing game plan were of "unknown knowns" (at least to the non-cognoscenti).[11] *See* Bush Decl. - Ex. O at 125 (Rothstein Dep.) and Ex. U at 138 (Lohr Dep.). Those they identify include: (1) the bids and budgets Repat allocated to keywords; (2) the amount of website traffic (clicks) that resulted from specific keywords-ad combinations; (3) the number of emails Repat received that were

_____

being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." R.I. Gen. Laws § 6-41-1(4).

[11] Apologies are owed to Donald Rumsfeld, the former U.S. Secretary of Defense: "There are known knowns. These are things we know that we know. There are known unknowns. That is to say, there are things that we know we don't know. But there are also unknown unknowns. There are things we don't know we don't know." Department of Defense News Briefing (Feb. 12, 2002), *available at* <http://archive.defense.gov/Transcripts/Transcript.aspx?TranscriptID=2636>

generated by that traffic; (4) the revenue produced as a result of customers clicking on ads tied to the specific keywords; (5) the cost to acquire a customer (CPA) for each keyword; (6) the return on investment (ROI) for each keyword; and (7) the performance of Repat's various ads, including the amount of traffic, revenue, email sign ups, CPA and ROI associated with each ad and its contents. Without factual or unrebutted expert testimony (neither of which defendants have offered), whether Repats' marketing strategy as defined amounts to a viable trade secret is a factual determination for a jury.

But there is more. "[T]here must be affirmative steps [taken] to preserve the secrecy of the information as against the party against whom the misappropriation claim is made." *Incase,* 488 F.3d at 53 (*citing J.T. Healy,* 357 Mass. at 730-731). Defendants contend that, in their consulting relationship with Repat, they were never told that the information that IndieWhip developed or that Repat shared was considered confidential. Repat concedes as much, but insists that confidentiality is implied in the consultant-client relationship and, moreover, that a client can reasonably expect that shared information will be used solely for its benefit, something that weaponizing a third-party as a direct competitor is not. *See* Def.s' Ex. O at 104 (Rothstein Dep.); Ex. U at 389 (Lohr Dep.).

While the existence (or nonexistence) of an agreement to hold business information in confidence is an important factor in assessing the reasonableness of a party's actions, *see Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 11 (1st Cir. 2000), the law does not "define the scope of a confidential relationship by looking exclusively to the parties' express agreements." *Diomed,* 417 F. Supp. 2d at 145. "A confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered."[12] *Burten*, 763 F.2d at 463 (citing Milgrim on Trade Secrets § 4.03 at 4-12). Where a disclosure is made in order to promote a specific relationship, the parties will generally be bound to hold that information in confidence. *Id.*

However, an implied confidential relationship will be defeated by the voluntary disclosure of the trade secret, *without limitation*, to another. *See Burten*, 763 F.2d at 463 (emphasis added). Defendants contend that Repat forfeited any reasonable expectation of confidentiality by disclosing the very marketing information that it claims is protected.

> In addition to its owners' prolific blogging trumpeting its ecommerce techniques and successes, Repat provided access to

---

[12] Defendants argue that Repat failed in the Amended Complaint to specifically plead that it had an implied confidential relationship with Quintin, Kettelle, and Bruzzi in their personal capacities (as opposed to a relationship with IndieWhip). Def.'s Reply at 3. As IndieWhip is Quentin, Kettelle, and Bruzzi for all present purposes, the argument borders on silly.

> its so-called trade secrets to 1) Social Fulcrum; 2) Klaviyo; 3) GreenBanana; 4) Ecommerce Influence; 5) Jivaldi, LLC; 6) Jonathan Schwarz; 7) Boston radio station WBUR and its audience; and 8) Shark Tank. Repat did not require any of these entities to sign a nondisclosure agreement, nor did anyone from Repat inform any of them that Repat considered the information confidential.

Defs.' Mem. at 14; Defs.' SOF ¶ 54-77. Repat counters that "[e]ach [of these] vendor[s] knew that Repat's strategies and practices were confidential," and that any sharing of information was done with an expectation of confidentiality.

> Repat's Google AdWords, Facebook advertising and email marketing accounts are password protected. Those passwords are not, nor have they ever been, publicly available. Repat has provided access to its digital marketing accounts to third party vendors that Repat engaged to develop and manage its digital marketing campaigns. After Repat terminated vendors that had access to Repat's digital marketing accounts, Repat also terminated their access to Repat's accounts.

Repat Opp'n at 3. By changing the passwords to its marketing accounts, Repat contends that it "effectively communicated to Defendants what was also obvious, namely that any information gleaned from those accounts was confidential, not public, and provided to Defendants solely to enable them to provide services to Repat and not to share or use on behalf of themselves or others." Bauer Decl. - Ex. 1 (Interrog. #6). This argument is unsound.[13] If

---

[13] While Repat signed agreements containing confidentiality and nondisclosure provisions with two of its vendors – JB Media Group, LLC and

Repat's only act to protect its trade secrets was to lock the barn after the proverbial horse had absconded to the saloon, this half-baked measure is "so plain a breach of the obligation of a trade secret owner to make reasonable efforts to maintain secrecy as to justify the entry of summary judgment for the defendants." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.,* 925 F.2d 174, 177-178 (7th Cir. 1991) (although cautioning that "only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment"). *Cf.* 1 Milgrim on Trade Secrets § 1.04 (2017) ("Courts can be expected to be reluctant to find an absence of safeguards as a matter of law where there is evidence that the trade secret claimant engaged in some measures to safeguard secrecy.").

Putting aside the too-close-to-call prophylaxis issue, defendants argue that Repat has failed to produce any tangible evidence of misappropriation and use. Repat attempts to rebut his claim by directing the court to the

---

Mischa Stevens – it chose not to do so with the others (Social Fulcrum, Klaviyo, GreenBanana, Google Adwords Account Managers; Facebook Advertising Account Managers; Ecommerce Influence, Jivaldi, Jonathan Schwartz, Justin Belleme, Adroll, and Sprucemail). *See id.* - Interrog. #10. As Rothstein himself testified, "[i]t's a ruthless world out there for small businesses," yet while schooled in business matters (Rothstein has an MBA), he stood by as Repat failed to require confidentiality agreements or directly inform the majority of its consultants that it considered the information it was sharing to be trade secrets. *See* Bush Decl. - Ex. H at 9; Ex. U at 216-218, 224-226, 229, 237, 246.

following.  First, in an email exchange between Quintin and Carlson immediately prior to the September 9, 2016 logistical meeting at which American Quilt was created, *see* Bauer Decl. - Exs. 14 and 15, Quintin's responses to Carlson's numerous questions contained references to Repat's revenues ("they cleared 4 MIL in 2015, on pace to do 8MIL in 2016"), and to Repat's spending on advertising ("last summer they were spending 110K a month between google and fb, and they spent 110K a month for two months on TV.  I imagine they're spending around 150-200K a month now."). However, general expenditures and revenues are not part of what Repat defines as its trade secrets.  *See* Opp'n Mem. at 3-4.

Second, Repat asks the court to compare the keywords that Repat and American Quilt deploy in their digital marketing campaigns.  "[M]any of the keywords that American Quilt uses in connection with its Google AdWords account are identical to those keywords that the IndieWhip defendants learned were among Repat's most successful keywords in generating clicks and conversions in its Google AdWords campaign."[14]  *Id.* at 7.  While there is

---

[14] Defendants' counsel argued at the motion hearing that Repat lacks standing to assert an "exclusive use" of keywords utilized in its digital marketing – that these words in fact "belong" rightfully to Google and/or Facebook.  But this argument misstates Repat's position, which is not that American Quilt is precluded from using the same key words as Repat, but that Quintin is precluded from sharing these key words with American Quilt.

an overlap of search terms (mostly variations on the theme "T-shirt quilt"), this supposed copying makes for pretty thin gruel. It is not a matter of surprise that companies selling similar or nearly identical products in ecommerce would use largely identical descriptive terms in hawking their wares.

Finally, Repat points to emails from Quintin to the owners of GreenBananas describing successes with certain key words, discount code marketing, and email flows, and recommending their use. Repat speculates that, based on the date range of these emails (in December of 2016), Quintin was referencing the cues and notices developed for Repat (American Quilt was then a new company with no Facebook or Google AdWords track record). *See* Bauer Decl. - Ex. 30 and Ex. 33.

Perhaps, but Repat is obligated in pursuing damages to set out specific evidence of use, not mere speculation. Instead, Repat complains that defendants "have not offered any comparison of American Quilt's Google AdWords, Facebook and email advertising practices to those used by Repat to demonstrate dissimilarity." Opp'n Mem. at 14. But a defendant is not required to demonstrate a negative – that it has not used a competitor's trade secrets. *See Carmona v. Toledo*, 215 F.3d 124, 133 (1st Cir. 2000) ("Courts are rightfully cautious about requiring a defendant to effectively 'prove a

negative' in order to avoid trial on a specious claim. Thus, if the summary judgment record satisfactorily demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden.").

We come to the heart of the matter.  When asked during discovery for its evidence of use, Repat vaguely responded that it "ha[d] not yet determined the scope and extent of Defendants use or disclosure of Repat's trade secrets. . . .  All of the negative keywords that they are not spending money on.  All of the language that they are using for t-shirt quilts. . . .  [I]t's a very specific thing, and all that information that they acquired while we were working with them, we believe they're using that information to start at a place that gives them an unfair advantage."  Bush Decl. - Ex. O (Rothstein Dep.) at 308-309.   Repat speculates that "[b]ased on [IndieWhip's] knowledge of Repat's trade secrets and direct involvement in the operation of American Quilt, it was and is inevitable that one or more Defendants would and will utilize Repat's trade secrets on behalf of American Quilt." Bush Decl. - Ex. S at 33 (Interrog. #7).  Lohr, however, acknowledged in his deposition that he has seen no loss in sales or drop in revenue or market share because of American Quilt's alleged use of Repat's trade secrets,

although he surmises that he could "see a lot of future damage being done in terms of loss of sales in the future." *Id.* - Ex. U at 391-392 (Lohr Dep.).

Notwithstanding its failure to show damages, Repat asserts that, under Rhode Island and federal law, evidence of actual use is not required – only that its "trade secrets are [potentially] useful to American Quilt." Opp'n Mem. at 16; *see also* 18 U.S.C. 1836 (b)(3)(A)(1) ("[A] court may . . . grant an injunction . . . to prevent any actual or threatened misappropriation."); R.I. Gen. Laws § 6-41-2 ("Actual or threatened misappropriation may be enjoined."). In *Fres-co Sys. USA v. Hawkins*, 690 Fed. App'x 72, 76 (3rd Cir. 2017), the Third Circuit held that

> [u]nder the statutes giving rise to [plaintiff's] causes of action, misappropriation of trade secrets need not have already occurred to warrant injunctive relief; threatened misappropriation is sufficient. . . . Given the substantial overlap (if not identity) between [employee's] work for [plaintiff] and his intended work for [defendant] . . . the District Court was well within its discretion to conclude [employee] would likely use his confidential knowledge to [plaintiff's] detriment.

*Id.* (citations omitted). Repat claims that there is evidence of "threatened use" by virtue of the incentive that American Quilt has to exploit what it is able to learn from Quintin's Repat-based teachings. This argument might have had some force at the outset of the litigation (the point at which, in the usual case, the perceived threat of use manifests itself in a prayer for a preliminary injunction). But now nearly two years have passed. American

Quilt is an established entity.  Repat's business is thriving.  If Repat can find no material evidence (direct or indirect) today that American Quilt has made use of its proprietary marketing secrets in the interval, the court is hard pressed to understand the nature of the "imminent and irreparable harm" that it is being asked to enjoin.  In sum, because Repat cannot show any dispute of material fact over actual damages, present or future, it has failed to carry its burden of proof with respect to its trade secrets claim.  Summary judgment will therefore enter for defendants.[15]

---

[15]  Repat's Chapter 93A claim under Massachusetts law fails for the same reason.  "[I]njury under chapter 93A means economic injury in the traditional sense*." Rule v. Fort Dodge Animal Health, Inc.,* 607 F.3d 250, 255 (1st Cir. 2010).

> To state a viable claim, the plaintiff must allege that she has suffered an "identifiable harm" caused by the unfair or deceptive act that is separate from the violation itself.  Put another way, a plaintiff must "show 'real' economic damages," as opposed to some speculative harm. Accordingly, a claim that alleges only a "per se" injury – that is, a claim resting only on a deceptive practice, regulatory noncompliance, or the "impairment of an abstract right without economic loss" – is insufficient to state a Chapter 93A claim.

*Shaulis v. Nordstrom, Inc.,* 865 F.3d 1, 10 (1st Cir. 2017).  The claim for injunctive relief under Chapter 93A also suffers a similar fate.  A person who has not yet suffered any loss of money or property as a result of a violation of section two "may obtain . . . an injunction *if* it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property."  Mass. Gen. Laws ch. 93A, § 11 (emphasis added).

ORDER

For the foregoing reasons, defendants' motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE